IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 13, 2017

**STATE OF TENNESSEE v. CHRISTOPHER HANK BOHANNON**

**Appeal from the Criminal Court for Putnam County**
**No. 11-0566  David A. Patterson, Judge**

───────────────────────────────

**No. M2017-00104-CCA-R3-CD**

───────────────────────────────

FILED
04/17/2018
Clerk of the
Appellate Courts

The Defendant-Appellant, Christopher Hank Bohannon, was convicted by a Putnam County jury of sexual exploitation of a minor for possession of over 100 images of a minor engaged in sexual activity (count one) and aggravated sexual exploitation of a minor based on the distribution, exchange, or possession with intent to distribute over 25 images of a minor engaged in sexual activity (count two), for which he received an effective sentence of eight years.  Tenn. Code Ann. §§ 39-17-1003(a)(1), -1004(a)(1)(A).  On appeal, the Defendant argues that: (1) the trial court improperly re-heard the Defendant's motion to suppress evidence; (2) the Defendant's statements to police during the execution of a search warrant at his residence should have been suppressed; (3) the evidence was insufficient to support his aggravated sexual exploitation conviction; and (4) the State made improper and prejudicial statements during its rebuttal closing argument.[1]  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Seth Crabtree, Cookeville, Tennessee, for the Defendant-Appellant, Christopher Hank Bohannon.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Beth Willis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

───────────

[1] We have re-ordered the Defendant's issues for clarity.

Between March and April 2011, Detective Yvette Demming of the Cookeville Police Department (CPD) conducted an undercover investigation into the Defendant's possession and distribution of child pornography. During her investigation, she engaged an online file sharing peer-to-peer network which enabled her to download multiple images of child pornography from a computer registered to the Defendant's internet protocol ("IP") address. She eventually executed a search warrant upon the Defendant's residence and seized two of the Defendant's computers. While executing the warrant, the Defendant admitted to possession of child pornography and to downloading the file sharing program on his computer. Subsequent examination of the computer hard drives seized from the Defendant's home revealed more than 100 images of child pornography.

As an initial matter, some discussion of the procedural history of this case is necessary for the resolution of the Defendant's issues pertaining to his motion to suppress. The Defendant apparently filed a motion to suppress evidence seized during the execution of the search warrant; however, no such motion is included in the record on appeal. Nevertheless, two hearings on his motion to suppress were conducted on October 8, 2012 (first hearing), and April 7, 2015 (second hearing). Although the reason for the delay in resolving the motion is not entirely clear from the record, it is apparent that the trial judge who presided over the first hearing requested supplemental briefing. While the briefing schedule was pending, the original trial judge retired, the attorney representing the State had relocated, and the attorney representing the Defendant had been permitted to withdraw. Significantly, and central to the issues raised in this appeal, the appellate record does not contain an order disposing of the motion to suppress from the original trial judge prior to his retirement. However, there is a reference in an October 19, 2013 Memorandum Order, signed by the original trial judge, which notes that, "[T]he defendant filed a pro se motion to suppress the evidence in the case *after the Court had ruled upon a previous suppression motion filed by his attorney. . . .* The Court finds that the issues raised by this motion have either been previously ruled upon by the Court or have no application to this case." (emphasis added). No other events occurred regarding the Defendant's case until it was set for trial in 2015.

At some point prior to the Defendant's February 2015 trial date, the State filed a motion requesting clarification of the initial trial court's ruling on the first hearing. The Defendant opposed the motion and insisted that no re-hearing was necessary because the original trial court had granted his motion.[2] In a March 10, 2015 order, the trial court, as the successor judge, noted that there was a transcript of the first hearing, but it did not contain findings of fact or a ruling disposing of the motion. It then set the Defendant's

---

[2] Neither the State's motion nor the Defendant's response is included in the record on appeal.

motion to suppress for a second hearing. The Defendant filed a motion seeking to set aside the trial court's March 10, 2015 order based on excerpts from transcripts from the original trial court.[3] In addition, defense counsel argued, inter alia, that the appropriate remedy was for the trial court to enter a "blank ruling" without findings of fact and require the State to apply for an interlocutory appeal. In denying the Defendant's motion, the trial court stated, in pertinent part:

> Further for the record I want to say that the transcript of the proceedings from [the first hearing], all of the proof being completed, on page fifty[-]eight the judge made this statement, there are quotes, the court, well my inclination is that he was not in custody. There might be some circumstances which would, some cases which would suggest circumstances similar to this that might be placing him in custody. There's another paragraph and then the judge goes on to say, [the Defendant], as I'm suggesting here, my inclination is to deny the Motion to Suppress, in that under case law you were not in custody. However, here's a person in his own home who is under some disability. Does that amount to custody? That question is left unresolved by this transcript.

> I have been provided by the attorneys other parts of transcripts, one from [August 1, 2013], and in that particular day the court says . . . . I didn't bring [the Defendant's] file with me today, I apologize, but I indicated that the court . . . would be ruling that the search warrant was valid and the coercive atmosphere would lead . . . to suppressing the statement that was given. That may be, those may be contradictory findings, but at any rate. So [the Defendant], I'm going to allow the search warrant that was issued to be ruled as valid so . . . evidence obtained from the search warrant would be admissible. The admission that you made in the room there with the officers when they first came in on the search warrant, I'm suppressing that. That was [the August 1, 2013 transcript]. That is the only part of the transcript that refers to what the court may have been thinking after it heard the testimony from [the Defendant's] case on [October 8, 2012].

> On September 5, 2012, I've been provided with another part of the transcript and [the assistant district attorney general], is addressing the court and he says, Your Honor, I don't want to get too far afield here. The court has made a ruling on the audio taped statement that was made of this

---

[3] Neither the Defendant's motion nor excerpts from the transcripts relied upon by defense counsel and submitted to the trial court are included in the record on appeal.

defendant's interview and the court ruled that was suppressed. And what [the assistant district attorney general] at that time . . . is asking for is a ruling by the court of whether during the cross examination of the defendant the court would find it to be a voluntary statement and it could be used by the state in cross examining the defendant. And there's no real answer to that either.

We move on to [September 16, 2013], and this has been provided by the attorneys, and it is regarding the same issue and there's a brief discussion by the court. The court says well we don't need to go a different route, we've been there once. In fact, I guess the court suppressed, granted the motion to suppress the statements you made. I believe that was correct, but the warrant was upheld.

After reviewing the above transcripts and arguments of counsel, the trial court described the original trial court's disposition of the motion as "very muddy" because there were no findings of fact or an order ruling on the motion entered on the record. The trial court then proceeded with the second hearing and considered the transcript from the first hearing in determining the merits of the motion to suppress.

At the first hearing, the Defendant moved to suppress the statements made to Detective Demming during the search warrant, arguing that the police officers failed to accommodate his disability, that he did not feel free to leave, and that his statement was not voluntary. Detective Demming testified that on April 26, 2011, she went with CPD Detective Lieutenant Bobby Anderson and Officer Eric Hall to execute a search warrant for the Defendant's residence. She had a recording device turned on before she knocked on the Defendant's door. When the Defendant answered the door, Detective Demming identified herself and told the Defendant that she and the other officers were there to execute the search warrant of his home. She told the Defendant several times throughout their conversation that he was not under arrest and that he did not have to speak with her. She said the Defendant agreed to speak with her and selectively answered some of her questions while choosing not to answer others. When the Defendant mentioned that he may need to talk to an attorney, she stopped talking with the Defendant. The Defendant then went to the restroom and when he returned, he asked her what other questions she had for him. She resumed the conversation and asked the Defendant specifically about his use of file sharing programs. The Defendant again chose which questions to answer or ignore and then asked her if they could "make a deal." In her testimony, Detective Demming confirmed that the Defendant was not under arrest and that he was free to leave at any time.

On cross-examination, Detective Demming testified that she was aware the Defendant had some sight issues but did not believe he was completely blind. Prior to the search warrant, Detective Demming performed surveillance on the Defendant's home and observed the Defendant walking unassisted and without a cane outside of his apartment. She testified that at the end of the search, she read the consent form to the Defendant, told him what items were being taken from his home as evidence, gave him a receipt of those items, and left a copy of the search warrant with him. She said the Defendant admitted to possessing child pornography on his computers and estimated that he had over 100 images and 50 to 100 videos. He also admitted to using file sharing programs, such as FrostWire, to download this material. She stated that the Defendant never questioned their identity or requested accommodations for his disability.

The Defendant testified that when he answered the door, he observed three individuals but did not know who they were because they did not identify themselves. He said that Detective Anderson refused to let him put on his shoes and told him that he was "not going anywhere." The Defendant said he was "blind and defenseless" and that the officers would not let him call someone or leave his home. He testified that he felt coerced into answering Detective Demming's questions and signing the consent form. The Defendant then testified that the officers actually identified themselves as police officers serving a search warrant but claimed that they refused to accommodate his disability.

On cross-examination, the Defendant agreed that his conversation with Detective Demming was mutual and consensual, that each of them asked questions, and that he chose which questions he wanted to answer. He also agreed that his voice did not sound panicked in the recorded conversation and that Detective Demming told him multiple times he was not under arrest.

At the second hearing, Detective Demming testified consistently with her testimony from the first hearing. In addition, she testified that, during the search warrant, she wore a vest with "POLICE" written on the front and that Officer Hall was wearing his duty uniform. Detective Demming identified exhibit 1 for the court as a disc copy of the recorded conversation she had with the Defendant during the execution of the search warrant. Detective Demming denied refusing to allow the Defendant to make a phone call. She explained that his phone and modem were not taken until the end of the search and had he wanted to make a call, he could have. She verified that her authority to search the Defendant's house came from the search warrant.

During Detective Demming's testimony, exhibit 1, the recording of her conversation with the Defendant during the execution of the search warrant, was played for the court. In that recording, Detective Demming identified herself and stated that she

and the other officers were there to execute the search warrant on his residence. Throughout her conversation with the Defendant, she affirmatively told him that he was not under arrest and that he did not have to speak with her. At one point in the conversation, the Defendant referenced getting an attorney. Detective Demming again told him that he was not under arrest but stopped questioning him immediately. The Defendant then asked to use the restroom and when he returned, he asked if Detective Demming had "any other questions[.]" Throughout the conversation, the Defendant avoided answering specific questions by asking if Detective Demming had any other questions. He stated that he "might be in a lot of trouble" and asked Detective Demming multiple times if they could "work out a deal[.]" Further along in the conversation, the Defendant admitted to possessing and masturbating to child pornography:

Detective: [D]o you have images on your computer of children engaged in sexual activity?

. . .

Defendant: Well, yes I do.
Detective: Ok, do you have any videos?
Defendant: Yes I do.
Detective: Ok, if you had to guess, do you think you have, how many images of child pornography do you think you have?
Defendant: I don't know. Fifty, maybe a hundred or so.
Detective: Ok. How many videos do you think you have?
Defendant: Two hundred. But some of those really wouldn't be considered child porn anyway.
Detective: Ok. Are they just, are they kids that have clothes on?
Defendant: Well, just because a child is nude does not mean that it's porn.
. . .

Detective: So would you masturbate to an image or a video of child porn?
Defendant: Yea. But you're not arresting me today?
Detective: No.

Detective Demming then asked the Defendant about his use of file sharing programs. He admitted to using FrostWire and that he was aware that it was a file sharing program that allowed users to share files amongst themselves. However, he claimed he did not know that other users could access his files. Throughout the

recording, the Defendant made several references to his limited eyesight, but he did not say he was completely blind, nor did he ask for accommodations.

The Defendant testified consistently with his prior testimony. In addition, he testified on cross-examination that he did not ask the officers to see their badges or to verify their identity as police officers. He said he did not verbalize his desire to leave or to make a phone call.

On rebuttal for the State, Detective Anderson testified that he accompanied Detective Demming and Officer Hall during the execution of the search warrant. He testified that they identified themselves to the Defendant and told him they were there to execute the search warrant. Detective Anderson did not recall the Defendant attempting to put on his shoes or asking to do so, but if he had, neither he nor the other officers would have stopped him. He confirmed that the Defendant was never told he was "not going anywhere" or that he could not leave or make a phone call.

The court denied the Defendant's motion to suppress his statement. The court's ruling and findings of fact were reflected in its order entered on April 22, 2015.

**Trial.** Detective Demming testified consistently with her prior testimony. In addition, she testified that on March 9, 2011, she began an undercover internet investigation searching for individuals who possessed, distributed, or shared child pornography through the file sharing program, FrostWire. She explained that each computer that uses the file sharing program is assigned a Global Unique Identifier ("GUID") which is a combination of numbers and letters specific to that computer. She specified that even if the Internet Protocol ("IP") address for a computer changes, the GUID remains the same. She testified that file sharing programs such as FrostWire incentivize users to download the peer-to-peer program to their computers. She explained as follows:

> [W]hen you download the program to your device, it will go through a series of steps as you're downloading. It reminds you that it is a file sharing program. You do have the option to opt out of that file sharing. You can turn it off and it reminds you as you're downloading this program that you do have the option to do that. However, you have some advantages. If you leave the file sharing option turned on, it allows you to obtain more files more quickly. If you're not sharing, you may be put last in line, it may take you longer to get downloads, you may not be able to get downloads from other people that are sharing files. So, it's an advantage to leave the file sharing option on.

During her investigation, she identified a local IP address that was using the file sharing program to share images and videos with file names indicative of child pornography. She said the internet provider identified the subscriber of that particular IP address as the Defendant. She then investigated the Defendant and gathered enough information to obtain a search warrant. From March through April 2011, Detective Demming was able to download multiple images and videos consistent with child pornography from the Defendant's computer through the file sharing program. She identified exhibit 1 as a disc containing the images and videos she downloaded from the Defendant's computer. Consistent with her prior testimony, Detective Demming also testified regarding the April 26, 2011 search warrant. She identified exhibit 2 as the recorded conversation she had with the Defendant during the search warrant. The recording was then played for the jury.

On cross-examination, Detective Demming testified as she had in prior hearings. In addition, she explained file sharing programs for the jury and stated that one of the default settings for the program the Defendant used was a shared folder. This shared folder stored the media downloaded by the Defendant and made it accessible to other users of the file sharing program. She testified that the Defendant admitted to downloading and having child pornography on his computer. She said that when she asked the Defendant about sharing files, he claimed that he thought he had to upload the files himself.

Detective Anderson testified consistently with his prior testimony. He identified exhibits 3 through 8 as photographs taken during the search warrant of the Defendant's home. The photographs of the Defendant's bedroom show his computer and television, the active desktop computer, the computer modem, and the fax machine connected to the bedroom computer monitor. There is also a close-up photograph of the bedroom computer showing a zoomed-in effect on the screen and a photograph of the Defendant's older computer, not in use, located in this living room. Detective Anderson also testified that he and Officer Hall seized the computers and modems as evidence and gave the Defendant an inventory receipt for the items taken. He stated that he then returned to CPD and locked the items into the evidence vault until they were retrieved for examination by CPD Captain Carl Sells. Detective Anderson testified that he was aware the Defendant had limited sight but had seen the Defendant move about the community unassisted and without a cane on multiple occasions.

Captain Sells, an expert in forensic computer analysis, testified that he examined the hard drives from the Defendant's computers and found 177 images and videos consistent with child pornography. Through his forensic analysis, he determined that the IP address that Detective Demming connected to and downloaded child pornography from during her undercover investigation was assigned to the Defendant's computer. He

also matched the Defendant's GUID to the same GUID that Detective Demming ascertained from the files she downloaded.

Captain Sells identified exhibit 1 as the disc he received from Detective Demming, which contained the images and videos she downloaded from the Defendant's computer. He examined the images and videos and confirmed that they contained child pornography. He then identified the hard drives retrieved from the Defendant's computers, his written forensic analysis report based on his examination of the Defendant's hard drives, and a disc containing the PowerPoint presentation of his forensic analysis report and the actual images and videos recovered from the Defendant's hard drives, all of which were admitted as exhibits at trial. The disc with the PowerPoint presentation contained each image and video's file name, file type, file path (where it was located on the Defendant's computer), creation date and time, a short description of the image or video, and, if applicable, the date that Detective Demming downloaded it.

On cross-examination, Captain Sells testified that the Defendant's child pornography files were stored in at least three different folders, including the shared folder set up by the file sharing program. He examined the computer activity that occurred at the same time the child pornography was downloaded and was able to determine that the most recently accessed items and areas of the computer were accessed by the Defendant.

The State then read into evidence exhibit 14, a stipulation by the Defendant that 112 images and 65 videos were recovered from his computer hard drives, all of which depict minors engaged in sexual activity as defined by statute. Rather than display all of the images and videos to the jury, the parties agreed to instruct the jury to consider the fact that all of the images depicted minors engaged in sexual activity as having been proven. After the State rested, defense counsel made a motion for acquittal which was denied by the court. The defense elected not to put on any proof and rested.

After deliberation, the jury found the Defendant guilty on both counts, for which the Defendant received a concurrent term of three and eight years' imprisonment, respectively.

**ANALYSIS**

**I. <u>Rehearing of Motion to Suppress.</u>** The Defendant contends that the trial court erred in re-hearing his motion to suppress. He argues that the original trial court "unequivocally stated its ruling to suppress" which was purportedly acknowledged by both the State and the successor trial court. By granting the State's motion to re-hear, he further argues that the successor trial court improperly allowed the State to re-litigate the

issue to the Defendant's detriment. In addition, and for the first time on appeal, the Defendant argues that by permitting the rehearing the trial court violated Rule 615 of the Tennessee Rules of Evidence because witnesses were permitted to "refine their testimony." In response, the State contends that the Defendant has waived this issue by failing to raise it before the trial court as well as failing to provide an adequate record on appeal. Waiver notwithstanding, the State argues that the original trial court did not enter a final ruling or make any findings of fact and therefore the State could not have sought an interlocutory appeal. Because the Defendant failed to provide the pretrial transcripts necessary to resolve this issue, the State argues that it is impossible to understand the context of the statements of the original trial court regarding suppression and that the successor trial court properly granted its motion to re-hear. We agree with the State.

Without belaboring the point, we decline review of this issue because the record does not contain any of the transcripts relied upon by the Defendant and submitted to the trial court for disposition. The State correctly observed that the Defendant failed to provide this court with the transcripts evidencing the statements by the original trial court. The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). Consequently, we conclude that the trial court's decision to re-hear the motion to suppress was proper.

**II.** **Denial of Motion to Suppress.** Next, the Defendant argues that the trial court erred in denying his motion to suppress. He specifically argues that his statements to Detective Demming during the execution of the search warrant were involuntary because he is vision-impaired, a condition which the officers failed to accommodate. As a result of his disability, the Defendant claims he was not free to leave, was coerced to speak with the officers, and should have been given Miranda warnings. In response, the State contends, and we agree, that the trial court properly denied the Defendant's motion to suppress because the Defendant was not in custody at the time of the search and his statement was voluntarily given.

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "Encompassed within both of these constitutional provisions is the right to counsel, which is applicable whenever a suspect

requests that counsel be present during police-initiated custodial interrogations." State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003).

Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986). "'The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment.'" State v. Downey, 259 S.W.3d 723, 733-34 (Tenn. 2008) (quoting State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996)); State v. Smith, 834 S.W.2d 915, 918-19 (Tenn. 1992)). In order for a confession to be considered voluntary in Tennessee, it must not be the result of "'any sort of threats or violence, . . . any direct or implied promise, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bran v. United States, 168 U.S. 532, 542–43 (1897)). In determining the voluntariness of a statement, the trial court must look at the totality of the circumstances and decide if "'the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)).

"A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." Smith, 933 S.W.2d at 455 (citing State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994)). Police officers are only required to advise a suspect of his Miranda rights prior to a custodial interrogation and Miranda warnings are not required in non-custodial interrogations. Miranda v. Arizona, 384 U.S. 436, 444, 478 (1966). In order to determine whether a person is in custody pursuant to Miranda, the proper inquiry is "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (internal citations and quotations omitted). Furthermore, the custodial determination is based upon "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996). "The warnings and waiver mandated by Miranda 'are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant' during custodial interrogation, whether inculpatory or exculpatory." State v. Northern, 262 S.W.3d 741, 749 (Tenn. 2008) (quoting Miranda, 348 U.S. at 476).

In denying the motion to suppress, the trial court determined that the recorded conversation between Detective Demming and the Defendant reflected "an interview, not an interrogation," noting that the court had no reason to believe the Defendant's statements and actions were anything but voluntary. The court found that the Defendant

- 11 -

seemed knowledgeable about what was happening, was selective about which questions he answered, and that the conversation seemed mutual. The court stated that it did not find any reason to believe the Defendant's disability gave rise to a custodial environment. The court ultimately found that the Defendant's statement was voluntary, that the conditions were not coercive, that the Defendant was not in custody, and that Miranda warnings were not required. Upon our review, we conclude that the record fully supports the determination of the trial court.

While the Defendant's argument in support of suppressing his statements is not entirely clear, he seems to suggest that his visual impairment created a per se custodial environment. He also implies that his visual impairment alone rendered his statement involuntary. The Defendant has not provided this court with any authority for this proposition, nor have we found any. In its order denying the defendant's motion to suppress, the trial court found that "[t]here were no threats, promises, inducements, or coercion by the police." Moreover, the trial court accredited the testimonies of Detectives Demming and Anderson who stated that the Defendant was not arrested, was not in custody, and was free to leave at any time. The recorded conversation reflects that Detective Demming identified herself, stated the reason for the officers' presence, and revealed the conversation between the Defendant and Detective Demming was mutual. The Defendant chose which questions to answer, promoted the continuation of the conversation, and the overall tone was calm and cordial. The record simply belies the Defendant's claims that he was not aware of the identities of the officers, was not free to leave, or that Detective Demming's questions were so coercive to deem his statements involuntary. The trial court's denial of the Defendant's motion to suppress was proper. Accordingly, he is not entitled to relief.

**III. Sufficiency of the Evidence.** The Defendant does not contest the sufficiency of the evidence supporting his conviction of sexual exploitation of a minor for possession of child pornography. Rather, he disputes his conviction of aggravated sexual exploitation of a minor, and claims the State failed to establish that he knowingly distributed child pornography. Because the shared folder on his computer was a default setting on the file sharing program, he claims he was unaware of its existence or how to change it. The Defendant argues the State failed to put forth evidence of distribution "outside the fact that the file sharing program was capable for distribution" and Detective Demming's actual ability to download child pornography files from the Defendant's computer.

In response, the State contends that the evidence is sufficient to prove that the Defendant knowingly distributed child pornography. The State argues that the Defendant knew that his file sharing program had the ability to share files with other program users. Recognizing this issue as one of first impression for this court, the State, relying on other

state and federal authority, submits "that the use of a file-sharing network can support a conviction for the distribution of child pornography." The State argues that by choosing the default settings and shared folder on the file sharing program, the Defendant was aware that his files may be shared with, and thus distributed to, other users.

In resolving this issue, we apply the following well established standard of review. The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1997); Farmer v. State, 208 Tenn. 75, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d. 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

When the State offers proof of guilt based on circumstantial evidence, the jury decides how much weight to give to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958) (internal quotation and citation omitted). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct

or circumstantial evidence.'" State v. Handson, 279 S.W.3d 265, 275 (Tenn. 2009) (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)).

In State v. Whited, our supreme court addressed the interpretation of Tennessee statutes on the sexual exploitation of children, specifically the Tennessee Protection of Children Against Sexual Exploitation Act of 1990, Tennessee Code Annotated sections 39-17-1001 to -1008 ("the Act"), which criminalized, among other things, the possession, distribution, and production of child pornography. 506 S.W.3d 416, 427-28 (Tenn. 2016) (citing Tenn. Code Ann. §§ 39-17-1003 to -1005; State v. Sprunger, 458 S.W.3d 482, 485 n.4 (Tenn. 2015)). It further explained that distribution (or possession with intent to distribute) is charged as aggravated sexual exploitation, a Class C felony:

> (a)(1) It is unlawful for a person to knowingly promote, sell, distribute, transport, purchase or exchange material, or possess with the intent to promote, sell, distribute, transport, purchase or exchange material that includes a minor engaged in:
>
> > (A) Sexual activity; or
> > (B) Simulated sexual activity that is patently offensive.

Id. (citing § 39-17-1004(a)(1)) (internal quotations omitted). In determining whether a person knowingly distributed the unlawful material, the statute further permits the trier of fact to consider "the title, text, visual representation, Internet history, physical development of the person depicted, expert medical testimony, expert computer forensic testimony, and any other relevant evidence[.]" Tenn. Code Ann. § 39-17-1004(a)(3). Accordingly, in order to prove aggravated sexual exploitation of a minor as charged in this case, the State was required to show that the Defendant knowingly distributed or possessed with the intent to distribute material that includes a minor engaged in sexual activity. The statute does not contain a definition for distribution. As such, before determining whether the evidence is sufficient to support the Defendant's conviction of aggravated sexual exploitation of a minor, we must first address the underlying question of statutory interpretation.

In construing the meaning of "distribution" within the statute, we recognize that our role is "'to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" State v. Pickett, 211 S.W.3d 696, 700-01 (Tenn. 2007) (citing Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002) (quoting Owens 701 v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). "Legislative intent is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.'" Id. (citing Osborn v.

<u>Marr</u>, 127 S.W.3d 737, 740 (Tenn. 2004) (quoting <u>State v. Flemming</u>, 19 S.W.3d 195, 197 (Tenn. 2000)). "When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use." <u>Id.</u> (citing <u>Boarman v. Jaynes</u>, 109 S.W.3d 286, 291 (Tenn. 2003) and <u>State v. Nelson,</u> 23 S.W.3d 270, 271 (Tenn. 2000)).

In resolving this issue, we must first acknowledge the plain meaning of the word distribution. Black's Law Dictionary defines distribute as "[t]o apportion; to divide among several[;] [t]o arrange by class or order; [t]o deliver[;] [t]o spread out; [or] to disperse." Black's Law Dictionary (10th ed. 2014). Merriam-Webster provides the following definition: "to divide among several or many: deal out . . . to give out or deliver especially to the members of a group." Merriam-Webster's Collegiate Dictionary (11th ed. 2011). Under the Obscenity Statute, which immediately precedes the Act in our code, and the Tennessee Pattern Jury Instructions, distribution means "to transfer possession of, whether with or without consideration[.]" Tenn. Code Ann. § 39-17-901(3); 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 34.04.

Next, while Tennessee courts have yet to define distribution for purposes of child sexual exploitation laws, we are guided by the following authority from other jurisdictions that have addressed this issue. In <u>United States v. Shaffer</u>, 472 F.3d 1219 (10th Cir. 2007), a federal agent downloaded multiple images and movies of child pornography by using a peer-to-peer file sharing network. The files were downloaded from the defendant's computer and forensic examination later revealed 19 images and 25 movie files containing child sexual exploitation. Following his conviction for distribution of child pornography, the defendant appealed, arguing that he could not be convicted of distribution, but only the lesser charge of possession. The defendant argued that his conduct of downloading images from a peer-to-peer network and storing them in his shared folder only met the elements of possession. The Tenth Circuit Court of Appeals disagreed and reasoned as follows:

> We have little difficulty in concluding that Mr. Schaffer distributed child pornography in the sense of having 'delivered,' 'transferred,' 'dispersed,' or 'dispensed' it to others. He may not have actively pushed pornography on Kazaa users, but he freely allowed them access to his computerized stash of images and videos and openly invited them to take, or download, those images. It is something akin to the owner of a self-serve gas station. The owner may not be present at the station, and there may be no attendant present at all. And neither the owner nor his agents may ever pump gas. But the owner has a roadside sign letting all passersby know that, if they choose, they can stop and fill their cars for themselves, paying at the pump by credit card. Just because the operation is self-serve, or in Mr. Shaffer's parlance, passive, we do not doubt for a moment that the gas

- 15 -

station owner is in the business of 'distributing,' 'delivering,' 'transferring,' or 'dispersing' gasoline; the raison d'etre of owning a gas station is to do just that. So, too, a reasonable jury could find that Mr. Shaffer welcomed people to his computer and was quite happy to let them take child pornography from it.

Shaffer, 472 F.3d at 1223-1224.

Many other federal and state courts have followed the reasoning in Shaffer in sustaining convictions for distribution of child pornography where the proof demonstrates that the defendant maintained child pornography in a shared folder through a peer-to-peer online network, knew that doing so would allow others to download it, and another person actually downloaded it. See e.g. United States v. Budziak, 697 F.3d 1105, 1109 (9th Cir. 2012); United States v. Chiaradio, 684 F.3d 265, 281-82 (1st Cir. 2012) ("distribution" occurs when an individual consciously makes files available for others to take and those files are in fact taken); United States v. Richardson, 713 F.3d 232, 236 (5th Cir. 2013) (same); United States v. Husmann, 765 F.3d 169, 175 (3d Cir. 2014) (noting that "no circuit has held that a defendant can be convicted of distribution [of child pornography] in the absence of a download or transfer of materials by another person"); United States v. Gorski, 71 M.J. 729, 734 (A. Ct. Crim. App. 2012) (military courts uniformly require the same and decline to include incomplete transfers of possession within the meaning of distribute as it relates to child pornography); Kelley v. Commonwealth of Virginia, 289 Va. 463, 469, 771 S.E.2d 672, 675 (2015) (installation and knowledge of peer-to-peer network which enabled others to download child pornography established knowing distribution of child pornography).

We now join the majority of other courts and conclude without hesitation that the Defendant's actions in downloading the peer-to-peer file sharing network on his computer, storing child pornography in his shared folder, and allowing others to download child pornography from it meet the definition of distribution within the meaning of the statute. The evidence unquestionably supports the Defendant's conviction of aggravated sexual exploitation of a minor. By consciously using a file sharing program, the Defendant was aware that distribution of files through the program was reasonably certain to occur simply by nature of the program. In the same way that he accessed files from other users, he allowed access to and consequently distributed his own files to other users. Furthermore, Detective Demming, acting as a FrostWire user, was able to access and download the files that the Defendant stored in his shared folder. The Defendant is not entitled to relief.

**IV. Improper Closing Argument.** The Defendant argues that the State made improper assertions in its closing argument by arguing facts not in evidence and outside

the scope of closing argument. The State argues that its closing argument was supported by evidence put forth at trial and inferences made from that evidence. We agree with the State.

During closing argument, the Defendant argued that he was not aware that his child pornography files were capable of being shared. In rebuttal, the State referenced the Defendant's shared folder, titled "My Shared Folder," where much of his child pornography was stored. The State asserted that such a folder name would put the Defendant on notice that the files stored in the shared folder would be shared with other users of the file sharing program. Defense counsel objected to the State's contention, arguing that the State was alluding to facts not in evidence and arguing outside the scope of closing argument. The trial court overruled defense counsel's objection.

The Tennessee Supreme Court has noted that "[c]losing argument is a valuable privilege that should not be unduly restricted." State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. Id. In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. Id. (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996).

In determining whether the prosecutor's improper conduct could have affected the verdict to the prejudice of the defendant, this court should consider the following factors:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see State v. Goltz, 111 S.W.3d 1, 5-6.

The Defendant takes issue with the State's rebuttal closing argument where it stated, "As an example, the file name is Desktop My Share Folder." He contends that most of his child pornography files "did not include the language 'myfileshare'" and that the State failed to establish that the files Detective Demming downloaded from the Defendant's computer came from a file titled "myfileshare." Here, the proof clearly established that the Defendant stored the majority of his 177 child pornography files in a shared folder. The Defendant's argument amounts to semantics-whether the State said "myfileshare" or "My Shared Folder." In our view, use of either phrase was neither improper nor impacted the outcome of his trial. The Defendant is not entitled to relief.

## CONCLUSION

Upon review, we affirm the judgments of the Putnam County Circuit Court.

_____
CAMILLE R. MCMULLEN, JUDGE